Michael M. CIRCELLI, Plaintiff,
v.
I. David BRAUNSTEIN, Defendant.

Civ. A. No. 1937.

United States District Court
D. Delaware.
July 29, 1958.

William H. Bennethum, Wilmington, Del., Saul, Ewing, Remick & Saul, Walter Biddle Saul, Gerald K. Burns, Philadelphia, Pa., of counsel, for plaintiff.

George T. Coulson (of Morris, Steel, Nichols & Arsht), Wilmington, Del., for defendant.

LAYTON, District Judge.

The plaintiff is a business and industrial broker maintaining an office in Philadelphia. He conducts his business everywhere. In May 1956, he alleges that he was authorized by the defendant to sell defendant's business. This was a ladies' dress business consisting of five stores operating in the Wilmington area. There was no real estate included in the sale, merely the inventory, good will, accounts receivable, etc. The defendant, it is stated, told the plaintiff that the sale would be consummated by way of a sale of all of the capital stock of the defendant's corporation; that he owned most of it and could "deliver all the stock." The price was $600,000.

The plaintiff contends that among other means of attempting to make sale of the defendant's business, he got in touch with one Burnside, a business broker in New York, and asked him to attempt to find a buyer. Thereafter, Burnside reported to the plaintiff that he had found a buyer (one Blauner) who was ready, able and willing to purchase the business on defendant's terms. However, the plaintiff charges that when he attempted to set a conference with the defendant to arrange the details of the sale, the defendant reported that the property was not for sale.

The defendant's motion for summary judgment rests upon two grounds, (1) that the terms of the arrangement between the plaintiff and defendant governing the sale being incomplete, the defendant was free at any point to revoke plaintiff's agency, and (2) that the arrangement called for a sale of the capital stock of the Braunstein business and, since the plaintiff had not procured a Delaware broker's license as required by 30 Del.C. § 2301, he cannot recover.

The law of Delaware governs here. In Delaware Apartments v. John J. Monaghan Co., 6 Terry, Del., 75, 69 A.2d 242, 245, the Supreme Court of Delaware stated:

"The law governing the right of real estate brokers to recover commissions for the sale of property is correctly stated by Gross, The Law of Real Estate Brokers, in part II, 'Commissions and Their Recovery,' Chap. III, Sec. 131 et seq.: 'The broker must produce a purchaser ready, willing and able to purchase on the principal's terms.'

"In Section 132, the author further speaks as follows:

" 'Whatever may be the terms and conditions upon which the broker's right to compensation depends, they must be performed as a condition precedent to a right of action for a commission. Where the terms of the sale are all given to the broker in advance, he must produce a purchaser ready, willing and able to purchase on those terms, and the owner may refuse any proposed purchaser who is not willing to purchase on all of those terms.

\* \* \* \* \* \*

" 'If no terms are laid down before hand by the principal, the broker takes the hazard. In such case the broker cannot recover com-

missions unless he produces a purchaser ready, willing and able to purchase on the terms, whatever they may be, then stated by the owner.' "

Inherent in this statement is the further proposition [1] that if only part of the terms are laid down in advance and other important terms remain to be negotiated then the broker still "takes the hazard."

In fact, this is general law. As said in Rest. Agency, § 445, Comment d, pp. 1039–40:

"d. Effect of completeness of terms given broker. The principal may either specify to the broker all his terms or furnish the broker with only part of the terms, the price for example, with the understanding that further details are subject to negotiation between the principal and the customer when found.

\* \* \* \* \* \*

"When the principal has furnished the broker with only part of the terms, with the understanding that further details are subject to negotiations between the principal and the customer when found, the principal is free to terminate such negotiations without liability to the broker. The principal's promise to pay the broker a commission does not become binding unless the principal and the customer reach a present definitive oral or written agreement. \* \* \* "

Turning to the facts of this case, it is to be gathered from the affidavits and depositions that plaintiff claims to have been given a contract for a 5% commission to sell the defendant's ladies' dress business consisting of five stores (four in Delaware and one in Philadelphia)

for $600,000 and that the sale was to be consummated by way of a transfer of the entire capital stock which carried with it the complete inventory, accounts receivable and debts. This the defendant must concede for the purposes of this motion. But he insists that important terms of the contract were not laid down in advance, among them the details of negotiating a lease for the Wilmington store. Thus, he argues that the Monaghan decision is controlling and that he was free to terminate the agency at any time without liability to the plaintiff. The testimony concerning the lease follows:

"Q. And he had told you that he owned the building? A. Oh, yes, they owned the real estate down here in Wilmington.

"Q. And you understood that the real estate was not to be considered at all? A. That is right.

"Q. Did he discuss with you what the leasing arrangements were between the store or the women's specialty business and the real estate? A. Well, I asked him that question myself. He said, 'Circelli, whatever they want, long lease, we will discuss that.' Naturally those things are generally discussed with the buyer. We honor that. We don't enter into any discussion of future business with the purchaser and seller.

"Q. Did he tell you what the amount of the lease would be? A. No, we didn't discuss that. That is a question to be taken up by the buyers.

"Q. Didn't it occur to you that it might be very important to a sale whether he wanted a high rent or a low rent? A. Well, you see, it is always taken up with the buyers and sellers themselves.

1. That this proposition is inherent in the opinion may be found from the whole language of the opinion as well as from the fact that the court cited Maier v. Romano, 102 Conn. 556, 129 A. 274, with

approval. In that case, the Conn.Sup. Court refused to award a broker his commissions where one of the terms of the contract regarding occupancy by the purchaser was not laid down in advance.

"Q. Well, you knew that would be a matter to be discussed and it would have to be negotiated later? A. *It has to be negotiated as far as the lease, of course. The terms of the lease, the length of the lease, the type of lease, sometimes on commission basis, on a sale, or sometimes straight leases; it all depends.*"

"Q. And you knew that unless that was satisfactorily negotiated that there couldn't be any sale? A. Well, that I don't know. Those things you never know. Those things are always negotiated.

"Q. They have to be negotiated? A. Always.

"Q. Before there can be a sale. A. We didn't enter into any discussion about the lease at all.

"Q. But you knew that he owned the building? A. Of course I did.

"Q. The family owned the building? A. Yes, I did.

"Q. *And the leasing arrangements would have to be negotiated before a sale could be concluded?* A. *Yes.*" (My emphasis.)

▆▆ Now, summary judgment will not be granted unless the plaintiff cannot recover under any conceivable set of facts which might be proven. Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213. True, the plaintiff, here, seems to concede that a vital term of the sale agreement, to wit, the negotiation of a lease or leases, had not been agreed on in advance between himself and his principal. But I cannot assume that the important business of the Wilmington store (if not some or all of the other stores) was being conducted without a lease. To the contrary, I would suppose that there was a lease either oral or written. If so, that lease was one of the assets of Braunstein which would pass to the purchaser with the sale of all the capital stock of the business. Then, what the plaintiff meant was, not the existing lease, but some lease which would be negotiated later.

I cannot assume that the plaintiff might not produce a buyer willing to purchase the business and at the same time be satisfied with the existing lease or leases which, for all we know at this stage, might have a year or several years to run. Accordingly, summary judgment will not lie under such a set of facts.

But the defendant maintains, in any event, that the plaintiff failed to produce a buyer ready, able and willing to purchase this concern upon the defendant's terms. For instance, he argues with much force that Blauner, the buyer named by plaintiff, was not the real buyer at all. If there was any buyer it was Cohan, the owner of 20% of the defendant's business, and there is an affidavit by Cohan that his offer was in jest—that he was not serious.

▆ The best I can make out of the moving papers is that, after the plaintiff got in touch with Burnside in New York, the latter phoned plaintiff that he had a purchaser. When asked who it was he said it was Eugene Blauner, a ready, able and willing purchaser on defendant's terms. The plaintiff then called Wilmington to set up a conference with Braunstein in Wilmington because he had a buyer and was informed that the business was no longer for sale. It seems to be conceded that Blauner was not the potential purchaser. He thought Cohan was and was coming to Wilmington to try to arrange a sale to Cohan and, very importantly to him, Blauner, to try and participate in the already divided commission. Whether or not Cohan was a ready, able and willing buyer is disputed. This is a curious set of facts and superficially does not present a strong case but the question here is under any conceivable set of facts, does it present any case at all. Sprague v. Vogt, 8 Cir., 150 F.2d 795, 801. We know that 2% of the commission was to go to one Isaacson and the remaining 3% to the plaintiff. But the plaintiff was free to divide his commission with anyone who would produce a ready, able and willing purchaser. Braunstein was not interested in what happened to the

commission. He was interested in a responsible purchaser. Thus, I must assume that there was some arrangement between the plaintiff and Burnside for a split commission if Burnside produced a responsible buyer. In turn, it is possible that Burnside might share his fractional part of the plaintiff's commission with another party if he produced a responsible buyer. Now, Blauner, knowing that the defendant's business was for sale, came to Burnside naming Cohan as a ready, able and willing purchaser. Burnside passed him, Blauner, on to the plaintiff. As I analyze the facts, it made no difference to the defendant, or to the plaintiff,[2] whether the purchaser was Blauner (as plaintiff thought) or Cohan, Jones, or Smith. The point was, when the plaintiff called the defendant for a conference, did he have available a responsible purchaser, no matter who. On this point, Blauner's affidavit says:

"Mr. Cohan then said to me in substance, 'If you can deliver the Braunstein business, I will buy it.' Although no specific purchase price was then or theretofore actually discussed between Mr. Cohan and myself, I understood Mr. Cohan's statement to mean that he would buy the business as outlined in the annexed prospectus, i. e., he would buy the capital stock at the value given to it on page 3 of the prospectus ($600,-000.)."

■ This statement is sharply contradicted by Cohan's affidavit which indicates he was not serious in making this offer. This, of course, raises a genuine issue of fact which would preclude the granting of this motion.

■ There remains for decision whether or not the plaintiff, as a matter of law, can recover because he had no Delaware stockbroker's license. This requires but brief consideration. The relevant portions of the statute upon which

the defendant makes his defense are these:

"No person shall engage in or carry on any trade or business for which a license is required by this part, without first having obtained a license therefor from the Tax Department and paid therefor the fee or tax prescribed in this part." 30 Del.C. § 2101.

"Persons engaged in the occupations listed and defined in this section shall pay annual license taxes at the rates specified below.

\*  \*  \*  \*  \*  \*

" 'Broker' includes every person engaged in the business of buying and selling for the account of other persons for a commission, or for profit, stocks, bonds, currency, negotiable papers, securities, and any other intangible personal property." 30 Del.C. § 2301.

In Strout Co. v. Howell, 4 Boyce 31, 85 A. 666, the Delaware Supreme Court refused to enforce a contract between a real estate agent and a seller for the former's commission in making sale of real estate because the agent had failed to obtain a real estate license. And in Allmon v. Crooks & Co., Inc., 6 Boyce 159, 97 A. 424, the Superior Court of Delaware arrived at the same result in the case of a plumber who had neglected to obtain a plumber's license. By the strongest analogy, then, the defendant urges that the plaintiff here, who had obtained no stockbroker's license, cannot recover. But there are important factual differences between this case and those just mentioned. In the Strout case, the agent was a resident of Delaware carrying on his regular business as a real estate agent and, likewise, in the Allmon case, the plumber was engaged in his day by day occupation in this State. Here we have a non-resident engaged in a single, or isolated, transaction. Not only that, but he was not

---

2. Inasmuch as Blauner was looking not to the plaintiff but to Burnside for a split of the latter's part of the commissions, it

could make no difference to the plaintiff who the purchaser was so long as he was ready, willing and able.

a stockbroker as defined by 30 Del.C. § 2301. He was a business or industrial broker who acted as an agent in the sale of businesses upon a commission basis. In this case, he was selling a business. The transfer of the capital stock of the corporation was the means by which the transfer of the business was to be consummated. The business might have been owned by an individual or a partnership. That it was a corporation and that the method by which this defendant elected to transfer title was by way of a sale of the stock was fortuitous. If the defendant were correct in his argument, the plaintiff also should have taken out a real estate license, for, as above observed, whatever lease or leases the various stores had, would have passed to the new owner.

While no Delaware case precisely on this point has been brought to my attention, there are well-reasoned decisions of other states arising out of similar facts which I must assume the Delaware Courts would follow were the question before them. Thus, in Meyer v. Wiest, 250 Pa. 573, 95 A. 715, it was held that compensation might be recovered for services rendered in an isolated transaction of buying or selling real estate or other property for a third party where the business of the plaintiff was not that of a broker. See also Ressler v. Marks, 308 Pa. 205, 162 A. 666, 86 A.L.R. 638, which arrives at the same conclusion. And the Court of Errors and Appeals of New York, with such distinguished jurists as Pound and Cardozo sitting, had this to say in a very similar case:

"The plaintiff does not claim to be a real estate broker. He is a business broker, buying and selling restaurants as places of business or going concerns of which the trade and good will form the subject-matter. The lease or real estate connected with such business is an element going to make up the value of the whole. He does not claim to be a broker for the purchase or sale of real estate and leases.

"The question presented on this appeal is whether such a business falls within the above provision of the Real Property Law and requires the plaintiff to take out a license. If so, any broker or business man who negotiates for the sale or transfer of any business enterprise or the consolidation of corporations which may involve the transfer and sale of real estate or an interest in real estate will be a real estate broker, unable to receive compensation, unless licensed.

\* \* \* \* \* \*

"The sale included the store, the lease, the good will, tables, and everything that went with the place. The lease had about six years longer to run and was, of course, considered of value to the purchaser. The restaurant or pastry shop had to be carried on in some store building or appropriate structure. Tenure for a definite period necessarily adds to the value of the good will of a restaurant or eating house where the customers may come because of the locality, as well as the proprietorship.

"Weingast testified that the main thing in a restaurant or any other business is the lease; i. e., the place where the business is being conducted and can be conducted. The lease, however, formed but one element in the value of this eating house as a going concern. It was a part of the good will. The defendant corporation had built up a trade which as a business enterprise it was willing and prepared to sell, and did sell through the plaintiff's efforts, \* \* \*.

"We do not think this provision broad enough to cover, or was intended to cover, every transaction in which an interest in real estate may be part of the subject of transfer. It does not apply to one who exercises the calling of selling or exchanging businesses as going concerns although, as part of the good

will, such sales may include the lease of a store or building. One who makes a specialty of procuring purchasers for restaurants, drug stores, grocery stores, and the like as going concerns, where a lease simply goes with the place as a part of the good will, does not become, within this law, a real estate broker. As failure to procure a license is made a crime, the statute must not be extended by implication. These views find support in Reichardt v. Hill, 6 Cir., 236 F. 817, 150 C.C.A. 79, where a similar ordinance was under discussion.

"The plaintiff was not in the business of procuring leases or in buying and selling leases or interests in real estate as such. He was engaged in negotiating as a broker the sale of pastry shops or restaurants as going concerns and places of business." Weingast v. Rialto Pastry Shop, 243 N.Y. 113, 152 N.E. 693, 694.

In my opinion, the plaintiff is not precluded under these facts from recovering his commissions because he failed to purchase a license as required by 30 Del.C. § 2301.

Whether or not his case will survive the test of a motion for directed verdict after the plaintiff has put in all his proof, and, if so, what conclusion a jury will come to, remains to be seen. Inherent in this situation is the possibility that the plaintiff may make a case for the jury. A proper caution requires that the warning of Judge Frank in Doehler Metal Furniture Co. v. United States, 2 Cir., 149 F.2d 130, 135, be heeded:

"We take this occasion to suggest that trial judges should exercise great care in granting motions for summary judgment. A litigant has a right to a trial where there is the slightest doubt as to the facts, and a denial of that right is reviewable; but refusal to grant a summary judgment is not reviewable. Such a judgment, wisely used, is a praiseworthy time-saving device. But, although prompt despatch of judicial business is a virtue, it is neither the sole nor the primary purpose for which courts have been established. Denial of a trial on disputed facts is worse than delay. * * * The district courts would do well to note that time has often been lost by reversals of summary judgments improperly entered."

The motion for summary judgment will be denied.